## WILSON ET AL. V. McLAUGHLIN ET AL.

Specific performance of a contract of sale should be granted where the preponderance of the evidence and the findings of the jury are to the effect that the contract was not fraudulently procured by misrepresentations of the vendees, although they may have made erroneous statements, and the vendors may have derived therefrom incorrect impressions as to the legal effect of a minor provision of the contract.

### Appeal from District Court of Pitkin County.

THE appellees were plaintiffs below, and filed their complaint, June 24, 1884, in which they alleged ownership in certain undivided portions of the Aspen Mammoth and Vallejo mining claims; that they had leased the same to said Wilson and McMurchey for the term of one year, commencing October 17, 1883, and that the said Wilson and McMurchey were in possession of the said premises by virtue of the said lease; that they had failed to pay the rental according to the terms thereof, whereupon the said lease had been terminated, and that certain interests under said lease had been transferred by said lessees to said Vandegriff, Gillaspie and Hewitt; that the parties were taking out large quantities of valuable ore from said mining claims; and asked for an injunction against the taking out of the ores, for restitution of the premises, for damages and general relief. To this complaint the appellants filed their answer denying the allegations of failure to pay and perform, and also their cross-complaint, alleging as follows:

"And the defendants, by way of cross-complaint against the said plaintiffs, do allege: *First.* That on, to wit, the 15th day of October, 1883, the said plaintiffs, being the owners of an undivided three-fourths interest in and to the Aspen Mammoth lode mining claim, and the undivided three-eighths interest in and to the Vallejo lode mining claim, described in the said complaint, did make and enter into a certain agreement in writing with

the defendants, Wilson and McMurchey, which said agreement in writing was in words and figures following, that is to say:

" 'This agreement, made and entered into this 15th day of October, 1883, between James McLaughlin, Sue McLaughlin and Charles A. Marshall, parties of the first part, and R. C. Wilson and Wm. McMurchey, party of the second part, of the county of Pitkin and state of Colorado, witnesseth, that whereas, the parties of the first part are the owners of the undivided three-eighths interest in and to the Vallejo lode, and of an undivided three-fourths interest in and to the Aspen Mammoth lode, situated on Aspen mountain, in the Roaring Fork mining district, in the county and state aforesaid, and the parties of the second part are desirous of leasing said mining property, with the privilege of buying the same, for time and at the price hereinafter stated; now, therefore, this indenture witnesseth, that James McLaughlin, Sue McLaughlin and Charles A. Marshall, of the county of Pitkin, in the state aforesaid, parties of the first part, are held and firmly bound unto R. C. Wilson and Wm. McMurchey, parties of the second part, in the penal sum of $20,000, lawful money of the United States, for the payment of which well and truly to be made we hereby bind ourselves, our heirs, executors, administrators and assigns, firmly by these presents. Sealed with our seals, and dated this 15th day of October, A. D. 1883. But the conditions of the above obligation are such that the above-bounden parties, James McLaughlin, Sue McLaughlin and Charles A. Marshall, in consideration of $1 to them in hand paid by the parties of the second part, the receipt of which is hereby acknowledged and confessed, have agreed to sell to the said Wilson and McMurchey the above-described premises, to wit, an undivided three-eighths interest in and to the Vallejo lode, and an undivided three-fourths interest in and to the Aspen Mammoth lode, for the sum of five thousand ($5,000) dollars lawful

money, which sum of money is to be paid to the said Marshall, James and Sue McLaughlin, or deposited to the credit of the last-named parties in a banking-house in the city of Leadville, or in the town of Aspen, on or before the 15th day of October, A. D. 1884; and the said Charles A. Marshall, James and Sue McLaughlin shall, on the 15th day of October, 1884, or at any time before, on the payment of the said sum of five thousand ($5,000) dollars, so to be paid as hereinbefore mentioned, make, execute, acknowledge and deliver to the said Wilson and McMurchey, or to such person or persons as they shall designate, a good and sufficient deed or deeds of conveyance of all the above-described property, showing a clear and perfect title, free from all liens and incumbrances whatsoever (except as against the government of the United States). Now, if the said R. C. Wilson and Wm. McMurchey shall fail to pay the said sum of money at the time aforesaid, and if the said Charles A. Marshall, James McLaughlin and Sue McLaughlin shall well and faithfully perform the covenants and agreements herein contained to be kept and performed by the parties hereto, then this obligation to be null and void and of no effect whatever, otherwise to be and remain in full force and effect. Now, therefore, it is especially agreed and understood by the parties hereto, that the said R. C. Wilson and Wm. McMurchey, parties of the first part, shall enter into the said premises, and shall have full and entire possession and control of the said premises, as of their own property, and shall perform work and make improvements on said property, from time to time, as they may deem best, to the amount of seven hundred and fifty ($750) dollars; provided, however, that the said work shall be done and completed, and improvements made, on or before May 15, 1884, and they shall, after May 15, 1884, perform work or labor, or make improvements, on said claim to the value of one hundred and fifty ($150) dollars on each and every month during the life of this

contract. And it is further agreed, by and between the parties hereto, that out of all ore taken from either of said mines or lodes the parties of the first part shall receive fifteen per cent. of the amount so taken, after first deducting the cost of transportation and treatment; that is to say, they shall receive for their share at the rate of. fifteen per cent. of the whole, as their interest in said property may appear, after deductions are made as hereinbefore provided. And it is further agreed that the parties of the second part shall dispose of all ore taken from said mines to such person or persons as they may deem best; and, after deducting the cost of transportation, milling or smelting, pay, or cause to be paid, the royalty as herein provided, at the rate of fifteen per cent. on the whole. And it is further agreed that this contract shall be binding and apply to any purchaser or purchasers, heirs or assigns, of any or all of the interests of the parties of the first part in and to the premises herein described. And it is further agreed that, in case the parties of the second part shall fail to perform the work on said lodes to the amount of seven hundred and fifty ($750) dollars, as hereinbefore mentioned, then it shall be at the option of the parties of the first part to declare this contract at an end, and re-enter and take possession of said lodes; and it is also agreed that the parties of the first part shall enter into and take possession of said lodes should the parties of the second part fail to perform the work, or to keep the agreements and covenants after May 15, 1884, as hereinbefore provided.

" 'In witness whereof the parties hereto have hereunto set their hands and seals the day and year first above written.

|                          |          |
|--------------------------|----------|
| " 'James McLaughlin,     | [SEAL.]  |
| " 'Sue McLaughlin,       | [SEAL.]  |
| " 'C. A. Marshall,       | [SEAL.]  |
| " 'R. C. Wilson,         | [SEAL.]  |
| " 'Wm. McMurchey.'       | [SEAL.]  |

"That, in pursuance and under and by virtue of the terms and conditions of said instrument of writing, the said Wilson and McMurchey — the said Wilson then being co-tenant with the said plaintiffs in and to the said mining claims — entered into possession of each and every part and portion thereof, and did begin the work of development thereon, as in and by said agreement in writing it was required. That one of the essential and paramount considerations of the said agreement was the right given therein to the said defendants Wilson and McMurchey to purchase the said interests of the plaintiffs in and to said properties, for the sum of $5,000 within the time aforesaid; and that without such consideration as a part and parcel of the said agreement, they, the said two last-named defendants, would not have entered into the terms and conditions thereof. That, as required by the said agreement, they did, before the 13th day of May, 1884, expend upon the said premises the sum of more than $750, and since that time they have expended the sum of more than $150 per month thereon, as required in and by the terms of the said contract of purchase. That during the time which elapsed between the said 15th day of October, 1883, and the 14th day of June, 1884, they did take and extract from the said mines about three hundred and seventy-nine tons of metalliferous-bearing ore, of which, during said time, they transported and sold about one hundred and thirty-four tons, receiving therefor, less the cost of transportation and treatment, the sum of about $11,209.79. That, with the returns and receipts from the smelters for each and every lot of ore so shipped as aforesaid, the said defendants did cause to be tendered to the plaintiffs, and each of them, their proportion of the royalties received from sales of said ores, as provided in said contract, which said tender was declined. That on, to wit, about the 22d day of March, 1884, the defendant McMurchey did sell, assign and transfer and convey, for a valuable con-

sideration, an undivided half of his interest in and to the said contract and agreement with plaintiffs to the defendant Vandegriff, who thereupon entered into possession of said premises with the said Wilson and McMurchey. That afterwards, and on, to wit, about the 11th day of May, 1884, said defendants McMurchey and Vandegriff, the said contract then and thereon, to wit, the day and year last aforesaid, did make payment of the first instalment of money, as in and by the said contract of sale he was required to do. That on, to wit, the 11th day of June, 1884, said defendant R. C. Wilson, said contract then and there being in full force and effect between the parties thereto, did make and enter into a certain contract of sale of all his interest in the said Aspen Mammoth and Vallejo claims to the defendant Gillaspie, in pursuance whereof the said Wilson did make and execute to the said Gillaspie a deed of conveyance of the said premises, which was deposited in escrow according to the terms and conditions of the said contract of sale. That the said Gillaspie did then and there pay to said Wilson the moneys required by the terms of said escrow to be paid at that time, and that the said defendants Hewitt and Gillaspie, under ʽand by virtue of the said contract of sale made with the defendants McMurchey, Wilson and Vandegriff, as aforesaid, did, on or about the date last mentioned, enter upon and into the possession of all the interests of the said defendants last above named in and to the said mining premises. That the said defendants Wilson, McMurchey and Vandegriff, on, to wit, the 14th day of June, 1884, did tender and offer to the said plaintiffs, in lawful currency of the United States, the just and full sum of $5,000, together with the said deed of conveyance, and did then and there also tender, in such lawful currency of the United States, to the said plaintiffs, in full, the amount of royalty to which they were entitled under and by virtue of the terms of the said agreement, to wit, the said sums of money in gross

which had accrued, and which had been previously
offered, as hereinbefore stated, together with a just and
full statement of the amount of ore taken, the amount
of ore sold, the amount of ore on hand, the receipts for
ore sold, and the cost of transportation and treatment,
for their examination; whereupon plaintiffs, and each of
them, did decline to take said statement, or to examine
the same, and did wholly decline and refuse to receive
the said sum of money so tendered as royalty, and as a
consideration for the said deed of conveyance, and did
also wholly refuse to sign the said deed prepared and
tendered by the said defendants as aforesaid, or to exe-
cute, acknowledge or deliver the same, or any other deed
of conveyance, either to the said Hewitt or any other
person or persons whomsoever. That the said Hewitt
and Gillaspie, the defendants aforesaid, being purchasers
under said contract of sale, and as of right they should
do, did enter into and upon the said premises, and take
possession thereof, and ever since have been in the pos-
session thereof as the purchasers of the said premises;
and they are now ready and willing, and are at all times
ready and willing, to perform the said contract of sale
and agreement with said plaintiffs of all and singular the
terms and conditions thereof. And the defendants, fur-
ther complaining, allege that, after the tender of the said
several sums of money, they did cause the same to be
deposited in the banking-house of J. B. Wheeler & Com-
pany, at, as, and for the use and benefit of the said
plaintiffs, and each of them, to be by the said banking-
house paid over to them upon the performance by them
of the terms and conditions of their said agreement, and
upon the delivery to said bank, or to any other person
or persons, for these defendants, of said deed of convey-
ance, as therein required; and they hereby offer to pay
the same, and each and every part thereof, or to deposit
the same with this honorable court, for the purposes
aforesaid, as this honorable court shall direct. And the

defendants, further complaining, allege that they did also, on the day last aforesaid, deposit, in the said banking-house, for the use and benefit of the said plaintiffs, and each of them, the said sum of money then and there tendered by them to the plaintiffs as royalty, pursuant to the terms and conditions of the said contract, as therein required to be by the said bank delivered to the said plaintiffs upon the performance by them of the terms and conditions of the said agreement."

Some further allegations were made, and specific performance prayed.

To this cross-complaint answer was made as follows: "The plaintiffs, for answer to the cross-complaint of the defendants herein filed in this cause, admit the execution of the agreement of lease, and that Wilson and McMurchey entered into the possession of the interest of the plaintiffs in said premises under the terms of said lease, and did begin work under said lease; but deny that one of the essential and paramount conditions of said agreement was the right given therein to the said defendants Wilson and McMurchey to purchase said interest of the plaintiffs in and to said properties for the sum of $5,000 within the time therein stated, and deny that said defendants would not have entered into said agreement of lease without the execution of the agreement to purchase, and deny that the agreement to purchase was any part of the consideration of said lease, or that said contract to perform work upon said premises was a consideration for the execution of said contract of sale, and deny that there was any consideration for such contract of sale. That after it was agreed between the said plaintiffs and Wilson and McMurchey what the terms of said lease should be, viz., that plaintiffs should lease them their interests in said premises, the said defendants McMurchey and Wilson prepared the lease, and included herein a contract of sale set out in said answer, and presented it to plaintiffs for their signature. That until

that time the plaintiffs had no notice, nor had any offer
or proposition been made by the said McMurchey and
Wilson to purchase the same. That, when the contract
was so presented for signature, the said Wilson and
McMurchey, on their attention being called to that pro-
vision concerning the sale of the premises, stated to the
plaintiffs that that was a mere option; that it was subject
to be revoked by them at any time, and was not binding
on them any longer than they saw fit to so regard it. That
the said plaintiffs relied upon said statement of defend-
ants that said contract of sale was an option that could
be revoked at any time. That, unless that they had un-
derstood that such was the effect of said contract, they
never would have signed the same. That the contract
and understanding between said plaintiffs and said Wil-
son and McMurchey was that they, the said Wilson and
McMurchey, were to have an option to purchase said
premises for $5,000 until such time as plaintiffs should
see fit to withdraw the same. That the said defendants
now assert that such is not the legal effect of said con-
tract, but that they have a right to enforce a specific per-
formance thereof, notwithstanding said plaintiffs have
withdrawn and revoked said option. That, if such is the
legal construction of said contract, then the said plaintiffs
were imposed upon by the said Wilson and McMurchey,
who fraudulently, and by false representations, procured
the execution by plaintiffs of a contract different from
the one intended by them. That as to whether the said
defendants expended more than the sum of $750 on said
premises, in labor and improvements, between the 13th
day of October, 1883, and the 15th day of May, 1884,
and as to whether, since that time, they have expended
the sum of more than $150 per month, in labor and im-
provements, upon said premises, the plaintiffs say they
have not and cannot obtain sufficient knowledge or in-
formation upon which to base a belief. And plaintiffs
allege that three hundred and seventy-nine tons of ore,

mentioned in said cross-complaint as the amount of ore by the defendants taken out between the 15th day of October, 1883, and the 14th day of June, 1884, is not all of the ore by the said defendants mined and taken out of said premises during said time; but that, during said time, the said defendants did mine, extract and take away from said premises five hundred tons of ore, all of which has been, as plaintiffs are informed and believe, sold by the said defendants, and the money received therefor; and the plaintiffs allege that the defendants received for said ore, so mined and sold by them, the sum of $30,000, instead of the sum of $11,209.79, as in said cross-complaint alleged; and said plaintiffs deny that the said defendants caused to be tendered or furnished to plaintiffs their proportion of the royalties received from the sales of such ore, as provided in said contract, and deny that any tender of the amount of money due them as such royalty was ever refused or declined by the plaintiffs. That as to whether the said McMurchey did sell, assign and transfer, for a valuable consideration, his interest in said contract to the defendant Vandegriff, and as to whether the said Vandegriff entered into the possession of the said premises with the said Wilson and McMurchey, plaintiffs have not and cannot obtain sufficient information upon which to base a belief; and as to whether the said Vandegriff made payment, and as to whether the said Wilson entered into said contract in said cross-complaint alleged with the said Gillaspie, and as to whether the said Wilson did execute to the said Gillaspie a deed of his interest in said premises, and as to whether the same was deposited in escrow, and as to whether the said Gillaspie paid to the said Wilson the consideration for the said deed, and as to whether the said Hewitt and Gillaspie made with the defendants McMurchey and Wilson the contract as aforesaid, and whether they entered upon the possession of all the interests of the said Wilson and Vandegriff, the plaintiffs have not and can-

not obtain sufficient knowledge or information upon which to base a belief. And the said plaintiffs deny that the said Wilson and McMurchey and Vandegriff did, on the 14th day of June, 1884, or at any other time, render to the said plaintiffs the sum of $5,000 in lawful currency of the United States or otherwise; and deny that the said Wilson, McMurchey and Vandegriff, at said time, tendered to the plaintiffs the royalties to which they were entitled under and by virtue of the terms of said lease; and deny that they tendered to them the sum of $825.61 as the amount of such royalty; and deny that they tendered to the said plaintiffs a complete, true and full statement of the amount of ore taken from said premises and sold by said defendants, or of the ore on hand, or the receipts for ore sold; but, on the contrary, the plaintiffs allege that the said defendants, at all times, have refused to make correct statements, and refused to inform the plaintiffs, or any of them, of the correct amount of ore taken by them from said premises under the said lease; and deny that the plaintiffs refused to receive any such statement, or to examine the same; and deny that they have refused to receive the said sum of $5,000, or the said sum of $825.61, or any other sum; but admit that they refused to sign a deed tendered to them by the said Wilson and McMurchey for the said premises, and refused to convey the same to the said defendants Wilson and Murchey or the said Hewitt; and deny that the said Gillaspie and Hewitt were purchasers of right under the said contract of sale referred to. That, as to whether the said Hewitt or Gillaspie took possession as in said cross-complaint alleged, the said plaintiffs have not and cannot obtain sufficient knowledge or information upon which to base a belief. And the said plaintiffs deny that the said defendants deposited the said sums of money, or any part thereof, in the banking-house of J. B. Wheeler & Co., or elsewhere, for the use and benefit of the said plaintiffs, to be by the said bankers paid over to them. That

after the execution of the same, on, to wit, the 22d day of March, 1884, the said plaintiffs notified the said Wilson and McMurchey that said offer was withdrawn, and said contract of sale was by them terminated, and that they would not sell the said premises to them for the said sum of £5,000, or any other sum, which said withdrawal of said offer, terminative of said contract, was by an instrument in writing duly signed by said plaintiffs, and was, at the time of service of same, duly recorded in the office of the county clerk and recorder of Pitkin county. And the plaintiffs deny that the said Wilson, McMurchey and Vandegriff have been damaged in any sum whatever; but, on the contrary, allege that they have wrongfully retained from the plaintiffs a large sum of money, to wit, the sum of $15,000, in violation of their contract to pay the same to plaintiffs as royalty. Said plaintiffs deny that the said defendants McMurchey and Wilson, or any of said defendants, have in any part complied with any of the terms or conditions of their said lease; but, on the contrary, they have wholly neglected, disregarded and refused to perform the same, or any of them. Said plaintiffs further deny that they have refused to receive any royalty, prior to the time of the termination of said lease, on account of the non-payment of the royalties therein reserved, and allege that they never have refused to receive any royalties due them prior to said time, to wit, the 14th day of June, 1884, at which time said lease was determined. Wherefore the plaintiffs pray that the said cross-complaint may be dismissed, and that they may have judgment for their costs in that behalf."

Upon the hearing certain issues of fact were submitted to a jury, as follows: "*First.* Did the said Wilson and McMurchey, or either of them, at the time of signing of the agreement in controversy, represent or say to the plaintiffs, or any or either of them, that said agreement, as to the sale before October 15, 1884, was only an option which could at any time be withdrawn by plaintiffs, and

did plaintiffs sign same relying on said representations, believing them to be true, and were they ignorant of the effect of said agreement? *Second.* Did the said Wilson and McMurchey, or either of them, at the time of the execution of said agreement, represent or state to the plaintiffs, or either of them, that the plaintiffs would receive fifteen per cent. of every dollar taken from said premises, after deducting transportation and treatment, and did they sign said agreement relying on said statements or representations? *Third.* How much ore was taken and mined from said premises since the making of said agreement, and how much was sold, and how much is there on hand and undisposed of, and how much money, if any, has been tendered to plaintiffs, or either of them?" By their verdict returned the jury answered the questions as follows: "To the first question on issue submitted to said jury it answered 'No.' To the second proposition submitted to it the jury answered 'Yes.' To the third proposition submitted to it the jury answered: 'Amount of ore taken from Vallejo and Aspen Mammoth, four hundred and sixty-one tons three hundred and forty-nine pounds; amount sold, one hundred and fifty-three tons seven hundred and thirty pounds; amount on hand or unaccounted for, three hundred and seven tons one thousand six hundred and nineteen pounds; amount tendered for royalty, $825.61; amount on hand, $5,000.' B. B. HILL, Foreman." Whereupon the court decreed as follows: "Now, on this 3d day of October, 1884, this cause coming on to be heard at chambers, pursuant to the stipulation of the parties hereto made at the last term of the district court in and for the said county of Pitkin, upon the evidence and the findings of the jury impaneled to try the issues submitted to them, raised by the cross-complaint of defendants, and the answer of the plaintiffs thereto, and the court, being fully advised as to all and singular the said matters, doth find — *First*, that the said defendants, before the commencement of this suit, tendered to plaintiffs the royalty

reserved in said lease by the terms thereof, as the same became due, and that the said plaintiffs are not entitled to the possession of said premises on account of a forfeiture of said lease, and on that issue finds for defendants, with their costs in that behalf expended. And it appearing to the court upon the evidence, and the findings of the jury upon the issues submitted to it, that the defendants are not entitled to the relief sought by them in their cross-complaint, nor to any relief or decree under their cross-complaint, it is, on this day, ordered, adjudged and decreed that the cross-complaint of the defendants be, and the same is hereby, dismissed, with costs. And it is further ordered that the defendants pay to the plaintiffs the costs of said cross-complaint to be taxed." The appeal is taken from the decree denying the relief sought by the cross-complaint, and dismissing the same.

Messrs. PATTERSON and THOMAS and J. M. DOWNING, for appellants.

Messrs. TAYLOR, ASHTON and TAYLOR and CLINTON REED, for appellees.

STALLCUP, C. It is apparent from the terms of the instrument set out that the leasehold estate, and the right to purchase the entire estate upon the terms specified therein, vested upon the execution of the said instrument, subject to be terminated and divested or defeated upon a breach of the conditions stated therein. Sec. 334, Pom. Spec. Perf. It also appears from the evidence, and from the findings of the jury and the court thereon, that all payments and conditions were duly made and performed, or duly tendered. It follows, then, that, if this contract was fairly entered into, the appellants were entitled to have a specific performance thereof.

From the evidence it appears that at the time this contract was entered into the mining claims had no established value; that in the month of February, 1884, the

lessees struck mineral of value, and commenced shipping ore therefrom, and thereby the practicable value of the property was established. As to the manner of and inducements for entering into the contract, the appellee Marshall, in his testimony, testified as follows: "Am one of the plaintiffs in this suit; one of the parties interested in the property in controversy. Am one of the persons who executed the lease. *Question.* You may state, about the lease, what conversation you had with the parties with reference to the lease before it was signed, and at the time of the signing, and all about it? *Answer.* I did not have any talk with them. I did not know anything about it, only what I heard from Mr. McLaughlin, my partner. I signed the lease, and there was not anybody present when I signed it." The appellee James McLaughlin, in his testimony, testified as follows: "*Question.* Then you would not sign that contract? *Answer.* No, sir. *Q.* What then? *A.* Well, then they brought another and bound themselves to work, and my recollection is that I signed it and took it to my wife to sign it. *Q.* What conversation did you have with your wife at the time you took it to her to sign? Was that this contract that is sued on? *A.* This same one. I don't think I ever submitted the other to her. I know I would not to her, or to Charley either, because I did not consider it fit to sign." And the appellee Mrs. Sue McLaughlin, in her testimony, testified as follows: "*Question.* Mrs. McLaughlin, are you one of the plaintiffs in this suit? *A.* I am. *Q.* Do you recollect about the execution of the contract described,— bond lease of the property? *A.* Yes, sir; I recollect about it. *Q.* I will ask you to state fully the circumstances concerning that transaction, the talk that you had with the parties before the leasing of it, and at the time of the execution of the lease? *A.* Well, in the first place, I will have to state that the parties had been trying to get the lease from us for some time. *Q.* What parties do you mean? *A.* I mean Wil-

son. No one else ever spoke to me on the subject at all, but he spoke to me quite a number of times for a lease on the property, and he said he had been at Mr. McLaughlin to get a lease, and he would not give him one, and he wanted me to give him one, and also to influence Mr. Mac to give him one; and, among other things he told me, he went on, and took the pains to explain to me that he was sure he could find mineral from the lay of the mine, the location of it, and all; that he was sure that he would get mineral if we would give him a lease. And so I spoke to Mr. McLaughlin on the subject, and we talked the matter over. I don't know how long it was after, but it was some time after,— we had several talks upon the subject,— when Mr. Mac told Mr. Wilson all right, he would give him a lease; or at least Mr. McLaughlin told me he had told him so, and I did not hear any more about it. I can't tell how long,— perhaps a week,— when Mr. McLaughlin came in one day, and he says: 'Here is the lease Mr. Wilson has sent up for you to sign.' I took it; and, as I was very busy, I laid it by. I did not look at it at that time,— perhaps for a couple of hours after; and I took the lease, and took the pains to read it, and sat reading it some time; thought over it, and laid it up in the desk. Mr. Mac came in afterwards, and asked me if I had signed it, and I said, 'No.' He says: 'Ain't you going to sign it?' And I says: 'I will if they will explain certain things in it to me.' Q. Come down to the time you had a conversation with Mr. Wilson. A. I would not sign the lease, at least until I could see the parties that made it, for some explanation; and Mr. Wilson came in one day. Mr. Mac says: 'Here is the man that has come for that lease for you to sign.' I says: 'Mr. Wilson, I want some explanation on this before I sign it.' He says: 'All right, Mrs. McLaughlin; I will give you any information I can on the subject.' And I asked him about this fifteen per cent. Says I: 'You being one of the lessees, I don't understand it, as we are the

only owners in it,— Mr. McLaughlin, myself, Mr. Wilson and Charley Marshall. I don't understand whether you are to get any of this fifteen per cent. or not; but I should think not, as you are one of the lessees.' He says: 'Mrs. McLaughlin, for every dollar taken out of there you get fifteen cents of it.' 'Well,' I says, 'that is what I wanted to know.' And furthermore I went on to state,— says I, 'About this bond; I don't know,— I never had thought anything of it at all.' I had never heard anything of the bond, and I had not thought anything about it; and says I: 'That is a very low bond. I don't know as I shall sign it at all.' He says, 'Oh,' says he, 'that is merely optional.' Says he: 'At the end of the time you can take the $5,000 or need not. It is the lease we are after.' 'Well,' says I, 'if that is the case, I will sign the lease;' and so I signed it. That is as near as I can recollect, that was the language used; at least, that is the substance of it that was used by us two. *   *   * Q. Now state what he said at some subsequent time about it? A. Well, it was one evening in the dining-room at the Clarendon. He came in. We were talking the matter over about a compromise; and I told him, says I, 'Mr. Wilson, you know that I never would have signed that if you hadn't told me that we were to get fifteen per cent., and so on.' And he says: 'I did tell you that, but I did not mean it in that way; I meant according to your interest; and you see it was there in black and white, and you put your name to it.'" Appellant Wilson, in his testimony, testified as follows: "Mr. McLaughlin, Mrs. McLaughlin, and McMurchey and myself were in the room. Mr. McLaughlin took his pen and signed the paper, and Mrs. McLaughlin was standing just over the counter by the safe, with the pen in her hand, talking about it, and 'Mr. Wilson,' she says, 'what does this fifteen per cent. mean?' Says I: 'It means fifteen cents on the dollar;' and, says I, 'Here is Mr. McMurchey, the man who drew it; he will explain it to you;' and then he

went on, and explained it to Mrs. McLaughlin what it really meant. *Question*. What did he say? *Answer*. He told her (Mrs. McLaughlin) it meant as it read, and that they were to get fifteen per cent. *pro rata* on the Vallejo; and he says: 'You get double as much on the Aspen Mammoth as on the Vallejo.' And she says: 'There is one thing in it I don't like, and that is the price. That is not enough.' And I says: 'Mrs. McLaughlin, I think it is a plenty for the property the way it stands.' And Mr. McLaughlin says, 'Yes.' She then signed the bond." The testimony of McMurchey was to the same effect.

The negotiations appear to have been carried on openly, fairly and deliberately. Doubtless there was some misunderstanding, and possibly erroneous statements were made of the fifteen per cent. royalty provision of the contract; but neither the evidence nor the findings are to the effect that any such statements were fraudulently made. If any of the parties were mistaken about the legal effect of this minor provision of the contract, it affords no sufficient reason for setting aside the contract, nor for denying specific performance thereof. 2 Pom. Eq. Jur. § 843. The decree should be reversed and the cause remanded.

RISING and DE FRANCE, CC., concur.

PER CURIAM. For the reasons assigned in the foregoing opinion the judgment is reversed and the cause remanded.

*Reversed.*